UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


IROQUOIS ON THE BEACH, INC.,
a Michigan corporation,

        Plaintiff,

v.

GENERAL STAR INDEMNITY
COMPANY,

        Defendant.
_____/

File No. 2:06-CV-233

HON. ROBERT HOLMES BELL

# **O P I N I O N**

      This matter is before the Court on the parties' cross-motions for summary judgment as to whether there is insurance coverage for the loss at issue. Plaintiff Iroquois on the Beach Inc. contends that the loss at issue was the result of a "specified cause of loss" and therefore the various exclusions are inapplicable. Defendant General Star Indemnity Company contends that the loss at issue was not the result of a "specified cause of loss" and that several exclusions are applicable. For the reasons that follow, as a matter of law, one exclusion is applicable independent of whether the loss at issue was the result of a "specified cause of loss."

**I.**

      Plaintiff operates a seasonal resort hotel known as the Hotel Iroquois on Mackinac Island, Michigan. Plaintiff is owned by Margaret Davey McIntire. The hotel is open from

approximately May 15 to October 15 each year.  The hotel is three stories tall, has forty-six guest rooms, a restaurant, and a bar.  The original building was built in 1903.  The last addition was in 1979 or 1980 ("1979/1980 addition").

Defendant has provided commercial property insurance to Plaintiff since June 1, 2002.  On September 6, 2005, Defendant issued Policy No. IAG389285B ("the Policy"),[1] effective September 1, 2005, and expiring September 1, 2006.  The Policy provides coverage for six structures, including the Hotel Iroquois.[2]

Several changes were made to the Hotel Iroquois as part of the 1979/1980 addition.  The 1979/1980 addition added two towers, a new dining room, and several guest rooms.  (Docket # 34, Pl.'s Br. in Supp., Ex. 5, McIntire Dep.  9:23-11:20.)  In July or early August of 2005, Mrs. McIntire met with Rick Marshall of Marshall Brothers Construction to discuss the work that was to be done on the Hotel Iroquois that fall.  (*Id.* at 17:6-18:4.)  During that meeting, one issue that was discussed was that the exterior wall on the back of the building would not hold paint.  (*Id.* at 17:25-18:14.)  The exterior wall at issue is the exterior wall of the 1979/1980 addition.  (*Id.* at 18:15-24.)  Mr. Marshall recommended that after the Hotel Iroquois closed for the season he and an architect inspect the 1979/1980 addition.  Plaintiff

---

[1] Plaintiff's motion for summary judgment makes reference to earlier policies; however, both counts of Plaintiff's amended complaint explicitly reference Policy No. IAG389285B.  (Docket # 23, Am. Compl. ¶¶ 6, 18.)

[2] The Policy originally provided coverage for seven structures; however, on October 31, 2005, Endorsement No. 2 reduced the number of covered structures to six.  The structure deleted by Endorsement No. 2 is not at issue in the matter before the Court.

contacted an architect by the name of Mark Buday to assist Mr. Marshall with the inspection of the 1979/1980 addition. (*Id.* at 19:23-20:13.)

On October 26, 2005, Mr. Buday, Mr. Marshall, and a structural engineer, Ryan Johnston, inspected the 1979/1980 addition. (*Id.* at 25:8-26:9; Pl.'s Br. in Supp., Ex. 6, Johnston Dep. 7:18-20.) As part of that inspection sections of the siding were removed from the 1979/1980 addition. (McIntire Dep. 26:12-27:5.) Shortly after the inspection Mr. Marshall shored up parts of the building because "[t]hey were concerned about a collapse." (McIntire Dep. 29:7-8.) On November 11, 2005, Mr. Johnston issued a report based on the October 26 inspection, along with some subsequent visits, in which he identified decay in several areas of the 1979/1980 addition. In the first floor of the southwest stairwell:

> The ½ " [gypsum wallboard ("GWB")] was saturated and badly deteriorated. 2x4 studs exhibited up to 100% decay[3] as well as the wall bottom plate to 100% section decay. The framing was saturated at the time of inspection.

(Pl.'s Br. in Supp., Ex. 8, Johnston Report 1.) In the south corner of the tower:

> The Typar [housewrap[4]] and Grace [Ice & Water Shield[5]] were wet upon exposure. The ½" plywood exhibited decay to 100% of section in areas. The wall bottom plate was probed to 50% decay of section. The pressure treated sill plate was saturated and soft but maintained section. The bottom of the 2x4 wall studs are experiencing decay.

---

[3] 100% decay means that the item being described has "no section remaining." (Johnston Dep. 22:1-2.)

[4] Typar housewrap is a membrane that is attached to the exterior of the sheathing on an exterior wall. (Johnston Dep. 16:14-23.)

[5] Grace Ice & Water Shield is a "rubberized, usually self-adhesive waterproofing membrane that goes around doors and windows." (Johnston Dep. 16:8-10.)

(*Id.*)  In the east side of the new dining room:

> The Masonite subfloor and ¾" floor sheathing near the east exit door exhibited 100% decay. The east wall of the new dining room area is buckling and requires emergency shoring. The wall studs, bottom plate and exterior sheathing exhibit decay to 100% of section. The treated rim joist is below grade and was probed to ½" decay penetration. Steel floor beams bearing on 2x4 wood stud columns were located on the east and south walls of the new dining room. These wood stud columns exhibited up to 100% decay at the wall bottom plate.
>
> With loss of wall sheathing, stud support, bottom plate and rim joist decay, this wall is hinge collapsing at the clear window header due to the weight of the three floors above. Emergency shoring of the steel beams and east porch roof was installed at the time of this report. Temporary shoring of the east wall must also be installed to support the upper three floors during wall reconstruction.

(*Id.* at 1-2.)  In the southeast corner of the tower at the second floor level:

> The corner trim has experienced up to ¾" of settlement with each repair. When removed the corner trim was covering ½" plywood with 100% decay near the corner. The 2x4 corner studs were probed to 100% decay. The wood bead board interior of the wall was dry and did not show signs of moisture. The tower appears to be suffering wind racking with loss of structural plywood sheathing, rim joist decay and stud decay.
>
> The east bay bumpouts at the second floor were also inspected and extensive structural decay was noted. Wall plywood sheathing, wall studs, floor sheathing, rim joist, floor joists and plates were probed with up to 100% decay of section.

(*Id.* at 2.)  Lastly, Mr. Johnston explained that:

> It is important to note that almost the entire wall area of the new and old dining areas consists of glass windows. The structure does not have enough plywood shear wall or steel frames to resist wind loading from the upper levels. The resulting building racking may have accelerated water penetration through the cladding elements. Due to the extreme marine environment, wind driven rain is penetrating the walls and causing the decay. The decay of the existing wall

4

> sheathing and wood stud framing has allowed horizontal and vertical movement of the structure. During wall repair the dining room walls will require steel shear frames to prevent wind/seismic events. These steel frames will require new foundation elements for anchorage.

(*Id.*) On November 12, 2005, Mr. Buday sent a letter to Mrs. McIntire explaining the causes of the problems with the Hotel Iroquois:

> Generally speaking, water is getting into the building envelope. I believe there are a couple of reasons for this:
>
> 1. There is not enough shear wall, or steel frame, to resist the wind load forces on the three stories above the old and new dining areas. The result is that the building will move or "wrack" during windy conditions. When this happens, small cracks develop at stress points and water is driven into the building.
> 2. The existing cladding system, materials and detail design, are not appropriate for the extreme climatic conditions on the site. High-pressure differentials during a storm are forcing water into the building envelope.
> 3. The existing grade around the building is either too high or sloped toward the building. In either case, ground moisture is seeping into the main level floor system above the foundation. In many areas, the earth or pavers are in direct contact with non-treated wood.
>
> The other common element, other than water, that has affected the building is time. All this has been going on for many years. Given the extreme climate of the site, it is my opinion that once water started getting into the building a hidden downward spiral began. Whether the water initially came in because of the wracking or because it was driven through the cladding system. It never dried out. The sheathing would decay a little; the building would move a little more, more water would come in. All this was happening behind the paint. And eventually the moisture caused the extreme decay outlined in the report.

(Pl.'s Br. in Supp., Ex. 9, Nov. 12, 2005 Letter from Mark Buday.) Mr. Buday then outlined three remedial projects:

> 1. A rigid steel frame is required around the perimeter of the main level

5

        dining rooms, tower base, and perhaps, the stairwell. This is the only way to stop the building from moving during a high wind. The windows also require steel wind mullions to resist excessive inward bowing.

2.     This site requires that the building have a rain screen cladding system. This type of system will provide a vented drainage plain to allow any water that gets beyond the exterior cladding to drain out while natural convection dries out the plain. This system will nautralize [sic] the pressure differentials between the inside and outside thus protecting the structural and thermal properties of the wall.

3.     The grade will be adjusted to prevent any water from flowing toward the building. Wherever the grade or exterior surface touches the building, appropriate materials will be used.

(*Id.*) On February 15, 2006, Mr. Johnston again inspected the Hotel Iroquois because of concern about "settlement noted at four steel columns of the old dining room section of the hotel." (Pl.'s Br. in Supp., Ex. 10, Mar. 6, 2006 Letter from Ryan Johnston 1.) Three of the four footings were removed and replaced with reinforced concrete spreading footings. (*Id.* at 1-2.) The total cost of the repairs to date is approximately $ 1.5 or 1.6 million. (McIntire Dep. 33:5-8.) That total does not include the cost of the repairs to the second tower, which had yet to be completed at the time that estimate was made. (*Id.* at 33:9-25.)

On December 1, 2005, Plaintiff notified Defendant of a loss. The date of the loss was reported as November 17, 2005. Plaintiff then forwarded to Defendant an April 17, 2006, coverage letter drafted by an attorney retained by Plaintiff that set forth the legal basis for Plaintiff's claim. (Pl.'s Br. in Supp., Ex. 12, Apr. 17, 2006 Letter from James C. Klemanski.) On May 8, 2006, Defendant sent a letter that denied coverage for the loss at issue and responded to the April 17, 2006, letter. (Pl.'s Br. in Supp., Ex. 13, May 8, 2006 Letter from

Scott McConnell.)

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the defendant carries its burden of showing there is an absence of evidence to support a claim, then the plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). Nevertheless, the mere existence of a scintilla of evidence in support of the plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiffs. *Id.*; *see generally*, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

When the moving party has the burden of proof, however, a somewhat different

standard applies. "'[W]here the moving party has the burden – the plaintiff on a claim for relief or defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting 11 James Wm. Moore, et al., *Moore's Federal Practice* § 56.13[1], at 56-138 (3d ed. 2000)). Thus, "[s]ummary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Lastly, the standards upon which the Court evaluates a motion for summary judgment do not change simply because the parties present cross-motions. *B.F. Goodrich Co. v. U.S. Filter Corp*. 245 F.3d 587, 593 (6th Cir. 2001). "'The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts.'" *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.

Cir. 1987)).

### III.

The Policy at issue in this case is what is known as an "all risk" policy. (Docket # 28, Def.'s Br. in Supp. 3.)  The policy provides coverage for "Risks of Direct Physical Loss," unless the loss is excluded or limited under the Policy. (Pl.'s Br. in Supp., Ex. 4, Sept. 1, 2005 Policy 50.)

> "All-risk insurance is a special type of insurance policy that, as a rule, covers every loss that may occur, except as a result of fraudulent acts of the insured." *Mull v. Equitable Life Assur. Soc. of U.S.*, 444 Mich. 508, 523, 510 N.W.2d 184, 190-91 (1994).  Notwithstanding the breadth of this statement, courts are in general agreement that all-risk policies, are not "all loss" policies. Under an "all risk" policy, an insured is entitled to recover for damage to the insured property regardless of the peril that caused that damage, but the term "all risk" does not stand for the proposition that an "all risk" policy permits an insured to recover for all losses or damages resulting from the accident.  *Fireman's Fund Ins. Co. v. Tropical Shipping and Const. Co., Ltd.*, 254 F.3d 987, 1008 (11th Cir. 2001).  All risk policies often contain express written exclusions and implied exceptions that have been developed by the courts over the years.  *Yale University v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 411 (D. Conn. 2002) (quoting *Costabile v. Metropolitan Property and Cas. Ins. Co.*, 193 F. Supp. 2d 465, 477 (D. Conn. 2002)).

*Tower Auto., Inc. v. Am. Prot. Ins. Co.*, 266 F. Supp. 2d 664, 667-68 (W.D. Mich. 2003) (Bell, C.J.).

"Interpretation of an insurance policy ultimately requires a two-step inquiry: first, a determination of coverage according to the general insurance agreement and, second, a decision regarding whether an exclusion applies to negate coverage." *Auto-Owners Ins. Co. v. Harrington*, 455 Mich. 377, 382, 565 N.W.2d 839 (1997). Plaintiff's motion contends that

9

Plaintiff has satisfied the first step of the inquiry. (Pl.'s Br. in Supp. 14-17.) Defendant's response does not dispute Plaintiff's contention that the first step of the inquiry has been satisfied; however, Defendant does contend that several exclusions are applicable. (Docket # 44, Def.'s Resp. to Pl.'s Mot.) Therefore, the question before the Court is limited to the second step of the inquiry – whether an exclusion applies to negate coverage. Defendant contends that coverage for the loss at issue is excluded by sections B.1.h, B.2.d, B.2.f, B.3.a, and B.3.c of the "Causes of Loss - Special Form."[6] Plaintiff contends that the asserted exclusions are inapplicable to the loss at issue. Plaintiff further contends that to the extent that the asserted exclusions apply, the asserted exclusions are inapplicable because the loss at issue is within the definition of "Specified Causes of Loss" as defined by section G.2 and the asserted exclusions do not apply to "Specified Causes of Loss."

If an insurer asserts that a claim is within an exclusion to the policy, then the burden is on the insurer to prove that the exclusion to coverage is applicable. *Heniser v. Frankenmuth Mut. Ins.*, 449 Mich. 155, 161 n.6, 534 N.W.2d 502 (1995); *Morrill v. Gallagher*, 370 Mich. 578, 587, 122 N.W.2d 687 (1963). Exclusions from coverage, when ambiguous, are construed against the insurance company and in favor of coverage. *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 50-51, 664 N.W.2d 776 (2003); *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 567, 489 N.W.2d 431 (1992). The question of whether an

---

[6] Unless indicated otherwise, all references to specific sections hereinafter are references to the sections of the "Cause of Loss - Special Form."

insurance contract is ambiguous is a question of law. *Wilkie*, 469 Mich. at 47.  "'A contract is said to be ambiguous when its words may reasonably be understood in different ways. . . . Yet if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear.'" *Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558, 566, 596 N.W.2d 915 (1999) (quoting *Raska v Farm Bureau Mut. Ins. Co.*, 412 Mich. 355, 362, 314 N.W.2d 440 (1982)).

The interpretation of an insurance policy is a question of law. *Wilkie*, 469 Mich. at 47. Michigan considers an insurance policy to be a contract, subject to the general rules of interpretation that apply to all other contracts, not a special set of rules unique to insurance policies. *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 461, 703 N.W.2d 23 (2005).  "'The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate.'" *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 197, 702 N.W.2d 106 (2005) (quoting *McIntosh v Groomes*, 227 Mich. 215, 218, 198 N.W. 954 (1924)).  The language of the parties "is the best way to determine what the parties intended." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 476, 663 N.W.2d 447 (2003).

**A.**   **Section B.1.h**

Section B.1.h provides:

B.   Exclusions

1.   We will not pay for loss or damages caused directly or indirectly by any of the following.  Such loss or damages is excluded regardless of any

11

>> other cause or event that contributes concurrently or in any sequence to the loss.
>
> . . .
>
> h. "Fungus", Wet Rot, Dry Rot and Bacteria
>
> Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

(Sept. 1, 2005 Policy 18, 50-51.)[7]

Defendant, as the insurer, has the burden of proving the applicability of this exclusion. *See Heniser*, 449 Mich. at 161 n.6. Defendant has not identified any deposition testimony or other evidence in which the loss at issue is attributable to wet rot. (Def.'s Br. in Supp. 6.) Defendant does direct the Court to testimony that attributes the loss at issue to moisture, but the identified testimony goes no further. (*Id.*) Defendant also does not offer evidence that testimony of moisture is equivalent to testimony of wet rot. In the absence of such evidence there is a genuine issue of material fact as to whether the loss at issue was caused by wet rot.

**B.     Section B.2.d**

Section B.2.d provides:

> B.     Exclusions
>
> 2.     We will not pay for loss or damage caused by or resulting from any of the following:

---

[7]Section B.1.h of the "Cause of Loss - Special Form" was modified by the "Fungus Clean Up and Removal Limitation Endorsement." The above quoted language reflects the modified language.

>     . . .
>     d. (1) Wear and tear;
>        (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
>        . . .
>        (4) Settling, cracking, shrinking or expansion;
>        . . .
>     But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

(Sept. 1, 2005 Policy 51-52.)

Defendant refers the Court to sections B.2.d(1), B.2.d(2), and B.2.d(4), but only identifies evidence in support of B.2.d(2). Therefore the Court will limit its analysis to the applicability of B.2.d(2). Defendant directs the Court to the report of Mr. Johnston. Mr. Johnston's November 11, 2005, report repeatedly identifies decay in the 1979/1980 addition. (Johnston Report 1-2.) At his deposition Mr. Johnston testified that as a result of the decay the east wall of the 1979/1980 addition is "hinge collapsing at the clear window header due to the weight of the three floors above." (Pl.'s Br. in Supp., Ex. 6, Johnston Dep. 26:1-3.)

Plaintiff does not dispute that the loss at issue is the result of decay; rather, Plaintiff contends that section B.2.d is inapplicable because the decay resulted in a "specified cause of loss" as provided by the closing paragraph of section B.2.d. The Policy defines "Specified Causes of Loss" as:

13

> "Specified Causes of Loss" means the following: Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

(Sept. 1, 2005 Policy 58.)  Plaintiff contends that the loss at issue was the result of a windstorm and therefore the section B.2.d exclusion is inapplicable.  Plaintiff contends that a windstorm during the policy period caused the wind racking that permitted water to enter the building envelope.  The Policy does not define windstorm and the parties offer competing definitions of what wind speeds constitute a windstorm.  Plaintiff contends that winds above 15 miles per hour qualify as a windstorm, while Defendant contends that winds must be at or above 55 miles per hour to qualify as a windstorm.  (Docket # 45, Pl.'s Resp. in Opp'n 5; Docket # 46, Def.'s Reply in Supp. 4.)  The Court, however, need not reach the question of the definition of a windstorm because there is a genuine issue of material fact as to whether there was a windstorm under either definition.  Plaintiff submitted an affidavit from meteorologist John McMurray.  (Pl.'s Resp. in Opp'n, Ex. 18, McMurray Aff.)  Attached as an exhibit to Mr. McMurray's affidavit is a table indicating wind speeds recorded at Pellston Airport Weather Station.  The table indicates that in September and October of 2005 there may have been winds of 56 miles per hour.  (McMurray Aff., Ex. B.)  The table includes data from 1979 through 2005 and does not indicate the year in which a particular wind speed was recorded. Thus the table is inconclusive because the winds of 56 miles per hour could have been recorded in September and October of 2005, or in September and October of 1985. Defendant directs the Court to testimony of Rebecca Barnwell.  Ms. Barnwell is the Food and

Beverage Director of the Hotel Iroquois and the daughter of Mrs. McIntire. (Docket # 28, Def.'s Mot for Summ. J., Ex. 5, Barnwell Dep. 4:12-14, 4:22-25.) Ms. Barnwell testified that she was not aware of any windstorm between July and October of 2005. (*Id.* at 15:19-23.) Ms. Barnwell's testimony does not include discussion of particular wind speeds. Mrs. McIntire also testified that she was not aware of any windstorms in the relevant time period and that she had not been told that the problems with the Hotel Iroquois were attributable to a specific windstorm. (McIntire Dep. 31:7-18.) Plaintiff also provides an affidavit from Mr. Johston in which he concludes that, based on his analysis, wind speeds of at least 40 miles per hour would have been necessary in order for water to have entered the building envelope. (Docket # 47, Pl.'s Reply, Ex. 20, Johnston Aff. ¶ 12.) The competing evidence from Ms. Barnwell, Mr. Johnston, Mrs. McIntire, and Mr. McMurray demonstrates that there is a genuine issue of material fact as to whether there was a windstorm in the relevant time period.

**C.  Section B.2.f**

Section B.2.f provides:

B.  Exclusions

2.  We will not pay for loss or damage caused by or resulting from any of the following:

    . . .

    f.  Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

(Sept. 1, 2005 Policy 52.) Mr. Buday, Plaintiff's architect, summarized the cause of the

15

problems with the 1979/1980 addition as: "Generally speaking, water is getting into the building envelope." (Nov. 12, 2005 Letter from Mark Buday. *See also* Pl.'s Br. in Supp., Ex. 7, Buday Dep. 30:23-31:4, 34:4-12.) Mr. Buday's summary is consistent with the testimony of Mr. Johnston, Plaintiff's structural engineer. (Johnston Report 2.) Mr. Buday also concluded that water had been getting into the building envelope "for many years" and Mr. Johnston agreed that this was a long-standing problem. (Nov. 12, 2005 Letter from Mark Buday; Johnston Dep. 67:16-22.) Plaintiff has not identified any evidence that is contrary to the conclusions of Messrs. Buday and Johnston. Thus there is no genuine issue of material fact as to the loss or damage having been caused by the repeated seepage or leakage of water or moisture over a period of fourteen days or more.

Plaintiff contends that section B.2.f nevertheless does not exclude coverage because the loss was the result of a covered cause of loss and an excluded cause of loss that occurred sequentially. Plaintiff contends that there is coverage under the policy because windstorms initiated the sequence of events that resulted in the loss at issue. Plaintiff notes that section B.1 excludes coverage "regardless of any other cause or event that contributes concurrently or in any sequence to the loss[,]" but section B.2 does not contain equivalent language. Although section B.2 does not mirror section B.1, the language of section B.2.f is unequivocal. There is nothing in B.2.f that supports reading that section to be inoperative if the loss occurs sequentially or if part of the sequence includes a covered cause. In order to read section B.2.f as not excluding coverage because of a sequential cause of loss the Court

16

would have to read words into section B.2.f. Moreover, Plaintiff's interpretation would also render the language in other sections that negates an exclusion if the loss has a "specified cause of loss" surplusage. For example, if Plaintiff's interpretation is correct then the language in section B.2.d that negates the exclusion when there was a "specified cause of loss" is unnecessary. Under Plaintiff's interpretation the Court could strike the last sentence of B.2.d, but still reach the same interpretation. "[C]ourts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp*, 468 Mich. at 468. Therefore Plaintiff's contention that section B.2.f does not exclude coverage because there may have been a "specified cause of loss" is contrary to Michigan law.[8]

There is no genuine issue of material fact as to the applicability of section B.2.f to the

---

[8]Plaintiff cites *Simonetti v. Selective Ins. Co.*, 372 N.J. Super. 421, 430-31, 859 A.2d 694 (N.J. Super. Ct. App. Div. 2004), for the proposition that if there is an anti-concurrent or anti-sequential clause in one section of a policy, but not in another, then there is coverage under the latter when a loss is the result of both a covered and an excluded cause of loss. There is no indication that the policy at issue in *Simonetti* contained language equivalent to the "specified cause of loss" language that is present in the policy at issue before the Court. In the absence of such language, the court in *Simonetti* did not confront the difficulty of rendering part of the policy surplusage. On that basis the Court finds the *Simonetti* decision distinguishable. The Court also notes that Plaintiff has not offered any analysis of why the Michigan Supreme Court would adopt the reasoning of *Simonetti*. *See In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005) ("In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court." (citing *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)).

loss at issue. The application of section B.2.f operates to negate coverage for the loss at issue under the Policy. No reasonable trier of fact could find for other than Defendant as to the applicability of the exclusion set forth in section B.2.f to the loss at issue.

**D.    Section B.3.a**

Section B.3.a provides:

> 3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>    a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

(Sept. 1, 2005 Policy 52.)

Section B.3.a only applies if one of the exclusions under section B.1 is applicable. Of the exclusions under section B.1, the only exclusion Defendant asserted is section B.1.h. The Court analyzed the applicability of section B.1.h and determined that there are genuine issues of material fact as to the applicability of section B.1.h. *See supra* Section III.A. Because there are genuine issues of material fact as to the applicability of B.1.h there are also genuine issues of material fact as to the applicability of B.3.a.

**E.    Section B.3.c**

Section B.3.c provides:

> 3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

18

>   . . .
>
>   c.   Fault, inadequate or defective:
>        (1)  Planning, zoning, development, surveying, siting;
>        (2)  Design, specifications, workmanship, repair, construction, renovation, remodelling, grading, compaction;
>        (3)  Materials used in repair, construction, renovation or remodeling; or
>        (4)  Maintenance;
>        of part or all of any property on or off the described premises.

(Sept. 1, 2005 Policy 52-53.) The sentence in the first paragraph of section B.3 negates the exclusion set forth in section B.3.c if the excluded cause results in a Covered Cause of Loss. Covered Cause of Loss is defined as:

>   A.   Covered Causes of Loss
>        When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:
>        1. Excluded in Section B., Exclusions; or
>        2. Limited in Section C., Limitations;
>        that follow.

(Sept. 1, 2005 Policy 50.) The definition of a Covered Cause of Loss is defined by reference to section B, which includes section B.3.c. Thus, the restoration of coverage is circular - the exclusion does not apply to a Covered Cause of Loss and there is a Covered Cause of Loss when the exclusion does not apply. The reference in section A to section B.3.c coupled with the reference back to section A in section B.3.c renders section B.3.c ambiguous. In consideration of this ambiguity, there is a genuine issue of material fact as to the applicability

19

of the exclusion set forth in section B.3.c.[9]

### IV.

For the foregoing reasons, there is no genuine issue of material fact as to the applicability of the exclusion set forth in section B.2.f. As the exclusion set forth in section B.2.f applies, there is no insurance coverage for the loss at issue under the Policy. A judgment will be entered consistent with this opinion.


Date:   October 12, 2007              /s/ Robert Holmes Bell
                                       ROBERT HOLMES BELL
                                       CHIEF UNITED STATES DISTRICT JUDGE

---

[9]The Court notes that this ambiguity is also present with respect to section B.3.a, as section B.3.a has the same introductory paragraph as section B.3.c. Thus the same genuine issue of material fact that is present as to section B.3.c is also present as to section B.3.a.